UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:06-CV-124-H

| | |
|---|---|
| CEMEX, INC. d/b/a KOSMOS CEMENT COMPANY AND KOSMOS CEMENT COMPANY | PLAINTIFFS |
| AND | |
| ST. PAUL FIRE & MARINE INSURANCE CO. | INTERVENING PLAINTIFF |
| V. | |
| LMS CONTRACTING, INC. AND LANDERS EXPLOSIVES, INC. | DEFENDANTS |

**MEMORANDUM OPINION**

Plaintiffs, Cemex, Inc. ("Cemex") and Kosmos Cement Company ("Kosmos") (collectively referred to as "Plaintiffs"), brought suit seeking recovery under tort and contract for damages from work that LMS Contracting, Inc. ("LMS") and its subcontractor Landers Explosives, Inc. ("Landers") (collectively referred to as "Defendants") performed on Cemex's property. St. Paul Fire & Marine Insurance Co. ("St. Paul") provided a Commercial General Liability insurance policy to LMS (the "Policy").

After LMS called upon St. Paul to defend and indemnify, St. Paul filed an Intervening Complaint to clarify its rights under the Policy. St. Paul now moves for summary judgment on the question of whether the insurance policy covers the damages in question. This is an

important question in this dispute because LMS has filed for bankruptcy and the Policy may be the only asset available to satisfy Cemex's claims. The Court decides the Policy coverage as a matter of law.

I.

Plaintiffs sought to build a slot storage facility and tunnel to process crushed limestone at Cemex's Battletown Quarry. Kosmos entered into a contract with LMS to perform the necessary blasting and excavation work (the "Contract"). LMS then subcontracted the blasting work to Landers. While the parties dispute the reasons, both parties agree that Landers' blasting did not meet the project specifications. Specifically, the Contract called for smooth vertical walls, which LMS did not deliver. The blasting created conditions known in the blasting industry as "backbreak and overbreak," which resulted in the walls not meeting contract specifications.

Plaintiffs demanded that LMS take responsibility for the required remedial measures. The parties disagreed about the cause of the remedial problems and about who should bear the responsibility of paying for the cost of the remedial work necessary to comply with the Contract specifications. Cemex said that LMS made a blasting mistake; LMS says that Cemex misrepresented the subsurface conditions.

Eventually, LMS defaulted on the Contract and filed for bankruptcy. Cemex was forced to undertake the remedial work itself in order to complete the construction of the storage facility and tunnel. Cemex alleges that Defendants' actions damaged its property in four areas of the slot storage facility and tunnel: 1) property outside the limits of the vertical walls of the excavation, 2) property in the tunnel area, 3) property in the area of the stacker conveyor foundation, and 4) property in the area of the escape tunnel. Furthermore, Cemex alleges certain

damages arose from Defendants leaving explosives on the work site.

During a conference with the parties, several important facts became clear. First, the alleged excessive blasting did not cause any disturbance above ground level. It damaged no structures or persons outside the surface area of the contract work. Rather, the alleged excessive blasting caused unstable conditions and loose rock below ground level. Second, the money recovery which Plaintiffs seek is exactly the same money recovery which it seeks in its breach of contract claim against LMS. It is the amount of money it claims was necessary to complete the work according to the Contract specifications.

St. Paul provided the Policy to LMS which was in force at the time the contract dispute arose. After LMS filed bankruptcy, the Bankruptcy Court lifted the automatic stay to allow Cemex to proceed against LMS in name only. LMS called upon St. Paul to defend and indemnify it under the terms of the Policy. St. Paul denied liability under the Policy, but did agree to defend. Subsequently, St. Paul filed its Intervening Complaint asking this Court to determine its obligations under the Policy. This currently pending motion for summary judgment followed.

II.

The Policy provides general liability coverage for LMS according to its terms and exclusions. In a previous Memorandum Opinion, the Court determined Kentucky law applies to this suit. Therefore, any ambiguity in the Policy is interpreted in favor of the insured. *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 638 (Ky. 2007). The parties dispute three issues: whether Plaintiffs' damages are "property damages" as defined by the Policy; whether the damages were caused by an "event;" and whether any Policy language

excludes otherwise covered damages. The first two of these are not dispositive.

The Policy defines "property damage" as physical damage to tangible property of others, including all resulting loss of use of that property; or loss of use of tangible property that is not physically damaged. Here, LMS did not impair the value of any existing structure or improvement. LMS did nothing to damage or limit the intended uses of the property. LMS had entered into a contract to disturb the property by blasting, all for the purpose of improving the property in accordance with the contract specifications. By failing to meet the requirements of that contract, one might conclude that property had been "damaged." However, such a definition certainly stretches the meaning of property damage beyond a common sense. Nevertheless, the definition of property damage contains no language precluding faulty workmanship from qualifying as property damage. For purposes of this discussion, the Court will assume that the blasting did cause property damage as the Policy defines it.

The Policy defines an "event" as an accident. Courts have debated whether an intended act can constitute an accident. The Kentucky Supreme Court has come down on the side that intentional conduct by the insured may qualify as an accident, where the result was unintended or unexpected. *See Bituminous Cas. Corp.*, 240 S.W.3d at 639. In *Bituminous*, the insured contracted with a homeowner to destroy a carport attached to the home. The employee carrying out the work intentionally tore down not only the carport, but also part of the home. The court held that the destruction was covered by the CGL policy, because the insured did not expect or intend for the damage to the house to result from the actions of their employee. *Id.* at 642. Similarly, LMS did not intend or expect the damage to Plaintiff's property, such as the backbreak and overbreak, to result from Lander's blasting. This unexpected result fits the

4

definition of an accident. Also, LMS did not intend or expect for explosives to be left on the job site, and as such the damage caused by leaving the explosives resulted from an accident.

### III.

An insurer and its insured allocate known risks arising from the insured's business by agreeing upon "business risk" exclusions in a general liability insurance policy. *Bituminous Cas. Corp.*, 240 S.W.3d at 640. As a consequence of this contractual allocation, the Policy will cover some risks, while others will require that the insured cover on its own. St. Paul argues that the Policy excludes coverage here in five ways: 1) the contract liability exclusion, 2) the control of property exclusion, 3) the pollution injury or damage exclusion, 4) the expected or intended bodily injury or property damage exclusion, and 5) the product recall exclusion. The Court will consider each as necessary.

The contract liability exclusion is easily resolved. It precludes coverage where the insured has assumed liability under a contract or agreement. The term "assume liability" means to take on the liability of another. In this case, LMS did not assume any liability by contracting with Cemex, because LMS has not agreed to take on another's liability. Thus the contract liability exclusion does not apply. Now the Court will next address a more difficult problem.

### A.

St. Paul argues that the Policy's control of property exclusion bars Plaintiffs' recovery. The exclusion denies coverage in four situations, two of which are pertinent to this case. First, the exclusion applies to damage to "[t]hat particular part of real property being worked on by or for you if such property damage results from your work." Second, the exclusion applies to damage to "[t]hat particular part of any property that must be restored, repaired, or replaced

5

because your work was incorrectly performed on it."

The phrasing of the exclusion has created debate where insureds performed work beyond the scope of the original contract. *See Bituminous Cas. Corp.*, 240 S.W.3d at 640. The debate centers around whether the phrase "being worked on" means only property that the insured contracted to work on, or means any property on which the insured performed work. The Kentucky Supreme Court ruled that the ambiguity created by such a provision should be construed against the drafter, and thus excludes only coverage for damages to property within the scope of the contract. *Id.* at 641. Under the facts in *Bituminous*, the exclusion did not bar coverage because its terms were ambiguous in those circumstances. Applying the same reasoning here, however, the result is different. The control of property exclusion does apply to all damages incurred within the scope of the contract between LMS and Cemex.

Here, the Contract required more than merely blasting a certain size hole in the ground. Rather, it required blasting for foundation and walls to certain written specifications capable of supporting poured concrete. Thus, when LMS overblasted the rock, the problem was not necessarily that the blasting actually damaged any existing improvement. It did not. Rather, the blasting created conditions that would not support the concrete to be poured. This is not merely a case where too much was destroyed, but a case where the walls that were to be created did not meet contract specifications. To correct the overblasting would require additional work and expense for which LMS might be contractually responsible.

Thus, the case is more analogous to a situation where a house cannot be built, because the foundation is too weak, than to the *Bituminous Casualty* case, where the house was destroyed, because the insured accidentally destroyed too much of the property. *Bituminous Cas. Corp.*, 240

S.W.3d at 636. Cemex's claimed remedies speak to this point. Through its remedial measures, Cemex created a stable foundation upon which the concrete could be poured. When viewed in this light, all of Cemex's damages resulted from LMS's faulty work on property where it had contracted to work. Where the remedy sought only restores the benefits of contractual promises, the damage falls within the scope of the work.

Thus, the control of property exclusion bars recovery for the additional expenses which Cemex incurred to complete the work in accordance with the Contract.

B.

Looking at this case from a broader perspective will help provide a proper framework for the Court's analysis. It helps demonstrate the correctness of the Court's policy interpretation.

To adopt Plaintiffs' interpretation of the Policy would provide insurance against the possibility that LMS would be unable to complete the contract due to its financial circumstances. Were LMS not bankrupt, Cemex would collect from LMS the money necessary to correct LMS's faulty work and get the product for which Cemex contracted. However, since LMS is bankrupt, Cemex cannot collect from LMS. Instead, Cemex has tried to characterize a breach of contract claim as a claim for property damages. But CGL policies are not intended to insure against the possibility of bankruptcy. One wishing to protect itself against such a risk will often require the builder to take out a performance or surety bond.

In fact, the contract between Kosmos and LMS included a provision relating to performance bonds. The provision required LMS to obtain a performance bond if request by Kosmos. This provision was separate from the provision that required LMS to carry a CGL policy. Therefore, Plaintiffs knew the proper method for protecting themselves against the

7

possibility of LMS going bankrupt, and knew the difference between a CGL policy and a performance bond. The failure of LMS to obtain a performance bond and the failure of Plaintiffs to require one, do not decide this case. On the other hand, Plaintiffs' failure to obtain a performance bond where it was clearly contemplated does not convert a CGL policy into a performance bond.

The Court is not alone in pointing out that CGL policies and performance bonds are separate and distinct protections against different risks. *See e.g. Stoneridge Development Co., Inc. v. Essex Ins. Co.*, 888 N.E.2d 633 (Ill.App. 2008); *Indiana Ins. Co. v. DeZutti*, 408 N.E.2d 1275 (Ind. 1980). While many courts look to the definitions of "property damage" or "occurrence" as excluding faulty workmanship, the Court has already held that those definitions may include faulty workmanship. Instead, the Court holds that the control of property exclusion precludes coverage for faulty workmanship in this case. While the Court has taken a different route, it has reached the same result as many other courts, based upon the distinct roles of CGL policies and performance bonds. This is a more faithful reading of the Policy as it does not require the Court to torture the clear language of the phrases "property damage" or "occurrence." Instead, it effectuates St. Paul's and LMS's intention to enter into a CGL policy and not a performance bond. The control of property exclusion and the damage to your products or completed work exclusion evidence this intention. While the completed work exclusion does not apply here, because LMS never completed the work, when the two exclusions are read together it is clear that the parties intended these exclusions to eliminate coverage for faulty work.

C.

Although the Court need not consider any of the other proposed exclusions, one final

issue remains. Plaintiffs argue that the explosives left on the property caused property damage in the form of lost use of the property and costs incurred to remove them. The same reasoning that governed the Court's prior analysis of the physical damage applies here. If leaving the explosives did not cause property damage, then the damage is not covered under the Policy. If leaving the explosives did cause property damage, then the question remains as to what property was damaged. In this case, leaving the explosives damaged the property that was being worked on. Plaintiffs have not pointed to any other property damaged by the abandoned explosives. Thus the Policy excludes both the damage caused by the blasting and caused by the abandoned explosives under the control of property exclusion.

   The Court will enter an order consistent with this Memorandum Opinion.

cc:  Counsel of Record